UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

PAULINE WEAVER             }
           PLAINTIFF    }
                      }
v.                        }      Civil Action No. __3:26CV-555-GNS__
                      }
LOUISVILLE-JEFFERSON COUNTY }
METRO GOVERNMENT      }
           DEFENDANT  }
                      }
Serve:    Mayor Craig Greenburg   }
          527 W. Jefferson Street    }
          Louisville, KY 40202      }

## COMPLAINT

Comes the Plaintiff, Pauline Weaver ("Pauline"), by counsel, and for her Complaint against Defendant, Louisville-Jefferson County Metro Government ("Metro") states as follows:

## PARTIES AND JURISDICTION

1. During the time period pertinent to the acts complained of herein, Pauline was a resident of Jefferson County, Kentucky and an employee of Metro.

2. Metro is a consolidated local government located in Jefferson County, Kentucky as defined by KRS 67C.101.

3. The events complained of herein occurred in Jefferson County, Kentucky.

4. The United States District Court for the Western District of Kentucky has jurisdiction over this matter as it involves a Federal Question under the Americans with Disabilities Act ("ADA") 42 U.S.C. § 12101 *et seq.*, the Family Medical Leave Act ("FMLA") 29 U.S.C. Chapter 28, the Age Discrimination in Employment Act of 1967 29 U.S.C. § 621 *et seq.*

("ADEA"), and the Civil Rights Act ("CRA"), 42 U.S.C. Chapter 21, and as vested by the United States Congress under 29 U.S.C. § 1132(e)(1).

5.     The United States District Court for the Western District of Kentucky has supplemental jurisdiction over the related State Law claims herein under 28 U.S.C. § 1367(1), as those claims are so related to Plaintiff's claims under the ADA, FMLA, and the CRA as to form part of the same case or controversy, since all claims arise from and/or relate to Plaintiff's termination from Metro.

6.     Pauline has filed two sets of charges with the Equal Employment Opportunity Commission ("EEOC") and has received right to sue letters on both sets of charges, attached hereto as **Exhibit "A"** and **Exhibit "B,"** respectively.

## FACTUAL ALLEGATIONS

7.     Pauline was employed by Metro as a Human Resources Compliance Coordinator from January 17, 2023, until her unlawful termination on or about April 24, 2026.

8.     As Compliance Coordinator, part of Pauline's duties involved ensuring that Metro was compliant with state and federal law, including the ADA and FMLA, and reviewing employee's leave requests.

9.     From approximately September of 2024, Pauline has been subjected to adverse terms and conditions of employment as compared to coworkers who are under 40, white, and/or not disabled.

10.     In September of 2025, Pauline herself found it necessary to apply for accommodations under the ADA due to chronic PTSD.  Part of Pauline's accommodations included a parking spot closer to the entrance of her building, and the ability to work from home the majority of the time.

11.    In October of 2025, Metro revoked Pauline's parking accommodation.  When Pauline complained about her accommodation being revoked, she was told that parking was a "privilege" and that she was not entitled to the closer spot, instead being given a spot a mile away from the building entrance.

12.    On November 6, 2025, Assistant Human Resources Director Ann Triebsch sent out information on a webinar entitled "*It's Not Called the Friday and Monday Leave Act!* Effective Ways to Protect Your Organization Against Misuse of FMLA and ADA Leave."  Ann's email included the comment "Boy, this one is on point!"  Pauline perceived this email to be mocking of employees such as herself who required both FMLA and ADA leave as a result of serious medical conditions.

13.    In November of 2025, Pauline renewed her telework accommodation.  The next day, Metro required her and other remote employees to begin filling out daily activity reports.

14.    Pauline complained that this requirement unfairly impacted employees who had telework accommodations under the ADA.

15.    Pauline also raised a concern that the requirement in effect negated her own accommodation since her ADA accommodation related to a mental health condition impacting her focus, concentration, memory, and cognitive processing.  On November 11, 2025, Pauline submitted a formal request for modification of the daily report policy.

16.    In an email to her supervisor, Pauline wrote that the requirement "significantly worsens these symptoms and creates additional stress and difficulty managing tasks. This administrative reporting interferes with my ability to perform the functions of my job effectively, as I was doing a great job before the extensive email report and activity sheets were required. I did very well during my previous accommodation."

17.    Despite Pauline's concerns, the daily report requirement persisted.  Compliance Coordinator Stephen Puckett denied Pauline's request to be exempted from the daily report requirement without engaging in the interactive process required by the ADA.

18.    On January 6, 2026, Vetta Johnson, a Compliance and Training Administrator with Metro, pressured Pauline to be more "vocal" and "vibrant," directly targeting the clinical symptoms of Pauline's disability and treating her disability as a performance flaw.

19.    On January 7, 2026, Pauline appealed the denial of her request to be exempted from the daily report requirement, noting that the denial reflected a failure to engage in a good faith interactive process, the temporal proximity of the requirement's implementation to her renewal of her accommodation, the distinction between essential functions of her job and marginal administrative tasks such as the daily report, and a note that the environment at Metro was increasingly hostile towards Pauline.

20.    Later that same day, again without engaging in any sort of interactive process, Human Resources Director Earnestine Booth denied Pauline's appeal and noted that per Metro policy "telework is a privilege."

21.    On January 8, 2026, Pauline fell in a Walgreens parking lot, resulting in significant injuries for which she is still undergoing treatment.  Following this incident, Pauline approached Metro about amending her accommodations to address her physical injuries.

22.    Vetta asked Pauline to supplement photos of her injuries.  This request made Pauline feel uncomfortable and harassed.

23.    On January 14, 2026, Pauline was instructed by Vetta to deny an employee's request for FMLA while the employee was suspended pending investigation.  Pauline raised concerns regarding the legality of this request, expressing to Vetta that she felt denial on those grounds was

unlawful. Vetta instructed that since the employee's suspension was not disciplinary, Pauline should deny the request. Pauline again raised concerns that this denial was unlawful but was ignored.

24. On January 20, 2026, Pauline disclosed knowledge that another Metro employee, Connor Spratt, had altered FMLA records for another employee. She made this disclosure via an affidavit signed and filed in a legal action filed by the subject employee.

25. On February 9, 2026, Pauline internally escalated fourteen specific case errors by Connor resulting in payroll overpayments and financial liability. To Pauline's knowledge, Connor was never subjected to discipline for these actions.

26. On April 9, 2026, Pauline informed Metro that she had filed an inquiry with the EEOC.

27. On April 10, 2026, Pauline was ordered to return to work and was told that if she did not she would be coded as absent without leave.

28. On April 16, 2026, Pauline submitted her first charge to the EEOC. In the charge, she stated "I believe I am being discriminated against based on my race, black, in violation of Title VII of the Civil Rights Act of 1964, as amended; my age, over 40, in violation of the Age Discrimination in Employment Act of 1967; and my disabilities, in violation of the Americans with Disabilities Act of 1990, as amended (ADA). I further believe I am being retaliated against for engaging in protected activity, in violation of the ADA."

29. On April 24, 2026, Pauline's employment with Metro was involuntary terminated. The reason given by Metro was a breach of confidentiality. This reason is pretextual.

30. On April 27, 2026, Pauline received her first right to sue letter from the EEOC.

31.     On April 28, 2026, Pauline filed a second charge with the EEOC regarding her termination.

32.     On April 30, 2026, Pauline received her second right to sue letter from the EEOC.

## COUNT I—DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

### *42 U.S.C. § 2112(a)*

33.     Pauline is disabled within the meaning of the ADA due to her mental health condition and her physical injury sustained in January 2026, as both conditions are impairments which limit Plaintiff's major life activities.

34.     Pauline was otherwise qualified for the position which she held with Metro, as shown by her work performance and complementary performance evaluations.

35.     Pauline suffered an adverse employment decision when she was terminated.

36.     Metro knew or had reason to know of Pauline's disability, as Pauline had made several requests for accommodation both relating to her mental health condition and subsequent to her physical injury in January 2026.

37.     Following Plaintiff's termination, her former position remained open and Metro sought other applicants, as evidenced by a June job listing for a Compliance Coordinator posted by Metro on LinkedIn.

38.     Under the ADA, Plaintiff is entitled to recover attorneys' fees as a result of Metro's discriminatory actions.

39.     Moreover, Metro acted with malice and/or reckless indifference to Pauline's federally protected rights, entitling her to an award of punitive damages under 42 U.S.C. § 1981a(a)(2) and (b)(1).

## COUNT II—RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

### *42 U.S.C. § 12203*

40.     Pauline engaged in a legally protected activity when she opposed Metro's policy of daily activity logs as same unfairly targeted individuals receiving telework accommodations and in particular served to negate Pauline's telework accommodation.

41.     Pauline further engaged in a legally protected activity when she filed a charge with the EEOC alleging that Metro had unlawfully denied and/or revoked her reasonable accommodations.

42.     Metro was aware of Pauline's legally protected activities as 1) Pauline's opposition of Metro's daily activity log policy was made to her supervisors within Metro and 2) Pauline emailed Metro to notify them that she was inquiring with and filing charges with the EEOC.

43.     Metro took an adverse employment action against Pauline when it terminated her employment.

44.     Pauline's protected activities and her termination are causally connected, as demonstrated in part by their temporal proximity.

45.     Under the ADA, Plaintiff is entitled to recover attorneys' fees as a result of Metro's discriminatory actions.

46.     Moreover, Metro acted with malice and/or reckless indifference to Pauline's federally protected rights, entitling her to an award of punitive damages under 42 U.S.C. § 1981a(a)(2) and (b)(1).

## COUNT III—RETALIATION IN VIOLATION OF THE FAMILY MEDICAL LEAVE ACT

### 29 U.S.C. § 2615

47.     Pauline engaged in protected activity when she completed an affidavit alleging that Connor Spratt had illegally altered another employee's FMLA records.

48.     Metro knew that Pauline had engaged in this protected activity when the affidavit was filed in the subject employee's lawsuit against Metro.

49.     Pauline suffered an adverse employment action when her employment was terminated.

50.     Pauline's protected activity under the FMLA was causally connected to the adverse employment action, as shown by the temporal proximity between the two.

51.     Because Metro acted in bad faith and did not have reasonable grounds to believe Pauline's termination was not a violation of federal law, Pauline is entitled to liquidated damages under 29 U.S.C. § 2617(1)(A)(iii).

52.     Pauline is entitled to attorney's fees under 29 U.S.C. § 2617(3).

## COUNT IV—DISCRIMINATION IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT

### 29 U.S.C. §§ 621-634

53.     Pauline was over 40 years old during the time period described herein.

54.     Pauline suffered an adverse employment action when her employment with Metro was terminated.

55.     Pauline was qualified for the position she held as shown by her work performance and complementary performance evaluations.

56.     Pauline was treated differently from similarly-situated individuals, including her colleague Connor Spratt.  In particular, though Connor Spratt had significant performance issues

and had committed errors resulting in financial liability to Metro, he was not terminated from employment.

57.    Connor Spratt was, to Pauline's knowledge, under the age of 40 during the time period described herein.

## COUNT V—RETALIATION IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT

### *29 U.S.C. § 623(d)*

58.    Pauline engaged in a protected activity when she filed her complaint with the EEOC alleging discrimination under the ADEA.

59.    Metro had knowledge of this protected conduct after Pauline communicated with them that she had both submitted an inquiry to the EEOC and filed a charge.

60.    Metro took an adverse employment action against Pauline when it terminated her employment.

61.    There was a causal connection between the protected activity and the adverse employment action as shown in part by the temporal proximity between the two.

## COUNT VI—RACIAL DISCRIMINATION IN VIOLATION OF THE CIVIL RIGHTS ACT

### *42 U.S.C. § 2000e,* **et seq.**

62.    Pauline is a member of a protected class as she is a black woman.

63.    Pauline was qualified for her job with Metro as shown by her work performance and complementary performance evaluations.

64.    Pauline suffered an adverse employment decision when her employment with Metro was terminated.

65.    Pauline was treated differently from similarly-situated individuals, including her colleague Connor Spratt.  In particular, though Connor Spratt had significant performance issues

and had committed errors resulting in financial liability to Metro, he was not terminated from employment.

66.     Connor Spratt is a white man.

67.     Pauline is entitled to attorney's fees under 42 U.S.C. § 2000e-5(k).

### COUNT VII—RETALIATION IN VIOLATION OF THE CIVIL RIGHTS ACT

*42 U.S.C. § 2000e* **et seq.**

68.     Pauline engaged in a protected activity when she filed a charge with the EEOC alleging racial discrimination.

69.     Metro knew about this protected activity when Pauline communicated to it that she had made an inquiry and filed a charge with the EEOC.

70.     An adverse employment action was taken against Pauline when her employment with Metro was terminated.

71.     There was a causal connection between the protected activity and the adverse employment action as shown in part by the temporal proximity between the two.

72.     Pauline is entitled to attorney's fees under 42 U.S.C. § 2000e-5(k).

### COUNT VIII—DISCRIMINATION IN VIOLATION OF THE KENTUCKY CIVIL RIGHTS ACT

*KRS § 344.040*

73.     Pauline is a member of a protected class as she is a black woman, over the age of 40, and disabled within the meaning of the Kentucky Civil Rights Act ("KCRA").

74.     Pauline was qualified for her job with Metro as shown by her work performance and complementary performance evaluations.

75.     Pauline suffered an adverse employment decision when her employment with Metro was terminated.

76.     Pauline was treated differently from similarly-situated individuals, including her colleague Connor Spratt.  In particular, though Connor Spratt had significant performance issues and had committed errors resulting in financial liability to Metro, he was not terminated from employment.

77.     Connor Spratt is a white man, to Pauline's knowledge is under the age of 40, and to Pauline's knowledge is not disabled.

78.     Pauline is entitled to attorney's fees under KRS § 344.450.

## COUNT IX—RETALIATION IN VIOLATION OF THE KENTUCKY CIVIL RIGHTS ACT

### *KRS 344.280*

79.     Pauline engaged in a protected activity when she opposed Metro's unlawful employment practices under the KCRA.

80.     Pauline's opposition of Metro's unlawful employment practices was known to Metro, as Pauline voiced her opposition to her supervisors.

81.     Metro took an adverse employment action against Pauline when it terminated her employment.

82.     There was a causal connection between the protected activity and the adverse employment action as shown in part by the temporal proximity between the two.

83.     Pauline is entitled to attorney's fees under KRS § 344.450.

## COUNT X—VIOLATION OF THE KENTUCKY WHISTLEBLOWER ACT

### *KRS § 61.102*

84.     Pauline was a public employee within the meaning of the Kentucky Whistleblower Act ("KWA").

85.     Metro is a public employer within the meaning of the KWA.

86.     Pauline made a protected disclosure under the KWA when she disclosed knowledge that Connor had altered the FMLA records of another Metro employee.

87.     This disclosure was made to an appropriate body or authority within the meaning of the KWA, the judiciary, through an affidavit provided by Pauline to the subject employee's attorney, who filed the affidavit with the Court.

88.     This disclosure concerned an actual or suspected violation of a law, statute, or administrative regulation of the United States (the FMLA).

89.     The KWA protects employees who testify in official proceedings with the same force as employees who make other disclosures of actual or suspected violations of law.

90.     Pauline was subjected to reprisal for this disclosure when she was terminated.

91.     This disclosure was a contributing factor in Pauline's termination.

92.     Moreover, Pauline made a protected disclosure when she internally elevated the fourteen specific case errors committed by Connor.

93.     This disclosure was made to an appropriate body or authority, Metro, with the ability to report or remedy the alleged wrongdoing within the meaning of the KWA.

94.     This disclosure concerned actual or suspected mismanagement or waste, in that the case errors resulted in payroll overpayments and financial liability for Metro.

95.     Pauline was subjected to reprisal for this disclosure when she was terminated.

96.     This disclosure was a contributing factor in Pauline's termination.

97.     Pauline is entitled to punitive damages and attorney's fees under KRS § 61.990(4).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, Pauline Weaver, demands as follows:

A.      For judgment against Defendant for actual, compensatory, liquid, and punitive damages, including damages for humiliation, personal indignity, and other intangible injuries in an amount to be determined at trial;

B.      For an award of her attorney's fees;

C.      For pre- and/or post-judgment interest;

D.      For a trial by jury on all issues so triable;

E.      For her costs expended herein; and

F.      For any and all other relief to which she may appear entitled.

Respectfully submitted,

/s/ Kyle M. Vaughn
Kyle M. Vaughn
Jillian M. Sauer
David P. DeKold
VAUGHN PETITT LEGAL GROUP, PLLC
7500 W. Highway 146
Pewee Valley, Kentucky 40056
(502) 243-9797
kvaughn@vplegalgroup.com
jsauer@vplegalgroup.com
ddekold@vplegalgroup.com
COUNSEL FOR PLAINTIFF

## VERIFICATION

I, Pauline Weaver, state under penalty of perjury that I am the Plaintiff in the foregoing action, that I have read all the statements contained herein, and that they are true and accurate.

*Pauline Weaver*

PAULINE WEAVER

COMMONWEALTH OF KENTUCKY ))

))

COUNTY OF Jefferson ))

21st Subscribed and sworn to before me by PAULINE WEAVER as her own free act and deed this day of JULY _____, 2026.

My Commission Expires: August 12th 2029
Notary ID Number: KYNP31298

NOTARY PUBLIC
Expires
8/12/2029
Anthony James Karsner
My Commission #
KYNP31298
COMMONWEALTH OF KENTUCKY

NOTARY PUBLIC, STATE AT LARGE